ATTORNEYS FOR APPELLANT
Andrew W. Hull
Sean T. White
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
R. Thomas Bodkin
Evansville, Indiana

ATTORNEYS FOR AMICUS CURIAE
DEFENSE TRIAL COUNSEL OF INDIANA
James D. Johnson
Evansville, Indiana

Christine M. Stach
Fort Wayne, Indiana

_____

### In the
# Indiana Supreme Court

_____

No. 47S01-0609-CV-319

INDIANA INSURANCE GUARANTY
ASSOCIATION,

*Appellant (Defendant below),*

v.

BEDFORD REGIONAL MEDICAL CENTER,

*Appellee (Plaintiff below).*

_____

Appeal from the Lawrence Circuit Court, No. 47C01-0309-PL-1030
The Honorable Andrea K. McCord, Referee

_____

On Petition To Transfer from the Indiana Court of Appeals, No. 47A01-0412-CV-504

_____

**March 28, 2007**

**Boehm, J.**

We hold that a policyholder of a failed insurance company may recover from the Indiana Insurance Guaranty Association for lost wages paid to a deceased claimant if the amount would have been reimbursable under the policy issued by the insolvent insurer.

## Facts and Procedural Background

James Brown was a patient at Bedford Regional Medical Center (BRMC) for three days before he died on January 13, 1997. Brown's estate sued BRMC for wrongful death and medical malpractice. The case was settled by BRMC's payment of $50,000 cash to the Estate and the purchase of an annuity in favor of the Estate for $25,001.[1] Before he entered the hospital, Brown had been gainfully employed at a wage of twelve dollars per hour and normally worked forty hours per week. The settlement agreement did not allocate the payments to any specific item of damages.

At the time Brown was treated at BRMC, the hospital was insured as a health care provider by PHICO Insurance Company with policy limits of $100,000 per person and $300,000 per occurrence. Shortly before Brown died, a Pennsylvania court ordered PHICO into liquidation. After settling with Brown, BRMC sought reimbursement from the Indiana Insurance Guaranty Association (IIGA) for its $75,001 cost of the settlement. IIGA is a statutory entity responsible for some, but not all, obligations of insolvent insurers. IIGA conceded that PHICO was an insolvent insurer and that PHICO's policy would have reimbursed BRMC for the full $75,001. IIGA nevertheless denied BRMC's claim, contending that the settlement was for lost wages of a decedent and that IIGA was not responsible for those damages.

BRMC sought a declaratory judgment that IIGA was obligated to reimburse it for PHICO's failed coverage. BRMC filed a motion for summary judgment, and IIGA responded with a cross motion for partial summary judgment. The trial court granted BRMC's motion and ordered IIGA to pay the stipulated amount of $75,001 to BRMC.

The Court of Appeals reversed, agreeing with IIGA that the Indiana Insurance Guaranty Act did not require IIGA to reimburse policyholders for their payments for lost wages of a deceased claimant. Indiana Ins. Guar. Ass'n v. BRMC, 841 N.E.2d 577, 584 (Ind. Ct. App. 2006). We granted transfer. 860 N.E.2d 590 (Ind. 2006).

### Lost Wages of a Decedent Under the Guaranty Association Law

---

[1] At the time of Brown's settlement, the Medical Malpractice Act limited the liability of a health care provider to $100,000 (now $250,000) and permitted additional recovery from a Patient's Compensation Fund. I.C. § 34-18-14-3 (1998). This settlement with a present value of $75,001 was sufficient to allow the Estate to make a claim against the Fund. I.C. §§ 34-18-14-4 and –5 (1998).

Over thirty years ago in response to the failure of a number of insurance companies, all fifty states and the District of Columbia enacted property/casualty guaranty association laws. James W. Hehner and Mark R. Smith, The Indiana Insurance Guaranty Association Act: More Problems Than Protection, 21 Ind. L. Rev. 223, 227-28 (1988). The Indiana Insurance Guaranty Association Law of 1971 ("the Act"), Indiana Code section 27-6-8-1-19, was generally patterned after the Model Insurance Guaranty Act promulgated by the National Association of Insurance Commissioners. Among the stated purposes of the Act were "to avoid excessive financial loss to claimants or policyholders because of the insolvency of an insurer" and "to provide an association to assess the cost of this protection among insurers." Ind. Code § 27-6-8-2. The Act created IIGA and required all insurers authorized to do business in Indiana to become members. I.C. § 27-6-8-5. Section 7 of the Act obligates IIGA to pay "covered claims"[2] of a liquidated insurer up to $100,000 per claim and $300,000 per occurrence. I.C. § 27-6-8-7.

There seems to be no dispute as to some general propositions. The IIGA is "intended to provide a cushion for insureds and claimants when the insolvent insurer is unable to pay claims pursuant to the policies it has issued." Ind. Ins. Guar. Ass'n v. William Tell Woodcrafters, Inc., 525 N.E.2d 1281, 1286 (Ind. Ct. App. 1989). But the Guaranty Association "does not completely step into the shoes of the insolvent insurer." Id.; see also Ind. Ins. Guar. Ass'n v. Blickensderfer, 778 N.E.2d 439, 442 n.2 (Ind. Ct. App. 2002). The Court of Appeals correctly observed that the Indiana General Assembly "intended to provide less protection" than was afforded under the Model Act. Ind. Ins. Guar. Ass'n, 841 N.E.2d at 584. These general propositions do not resolve the specific issue before us. Rather, the Act includes several limitations on IIGA's obligation to cover policyholders' losses from a failed insurer. The extent to which the Act affords protection to policyholders of insolvent insurers in any specific instance turns on the language of the statute.

Section 7(a)(i)(1) includes the following language at the heart of this dispute:

> In the case of claims arising from bodily injury, sickness, or disease, including death resulting therefrom . . . the amount for which the association shall be obligated shall not exceed the claimant's reasonable expenses incurred for necessary medical . . . services, including . . . funeral services, and any amounts actually lost by reason of the claimant's inability to work . . . .

---

[2] The term is defined in Indiana Code section 27-6-8-4(4). The parties raise no issue based on this definition.

This section also provides that a claim for wrongful death is "subject to the limitations provided by the wrongful death statutes of the state." Id.

IIGA has admittedly reimbursed policyholders of insolvent insurers who paid lost wages claims to claimants who survived. The Act does not explicitly differentiate between lost wages of living and dead claimants, but IIGA points to several aspects of the Act that it contends support its denial of BRMC's claim. IIGA contends that post death wages are not "actually lost" as that phrase is used in section 7(a)(i)(1). IIGA also argues that wages of a deceased claimant are not lost because of the claimant's "inability to work." The Indiana Act differs from the Model Act in two other respects that IIGA contends are relevant here. First, section 7(a)(i)(1) of the Indiana version limits the IIGA's liability in personal injury cases to "reasonable expenses incurred" for medical and funeral services and "amounts actually lost for the claimant's inability to work." I.C. § 7(a)(i)(1). The Model Act contains no similar language and makes no specific reference to "bodily injury." Only the Missouri, Nebraska, and Tennessee Insurance Guaranty Acts include language similar to the Indiana provision. Indiana is apparently the only state that has designated its Act's purpose as avoiding "excessive financial loss" rather than "financial loss." See I.C. § 27-6-8-2.

BRMC responds that the lost wages of deceased claimants through the date of settlement or judgment are "actually lost" as a result of the death. Because death prevented the decedent from working, BRMC argues that IIGA is obligated to reimburse BRMC just as PHICO would have if it were not insolvent. As BRMC succinctly puts it:

> The wages lost by a dead claimant are just as "lost" up to the date of settlement or judgment as are the wages "lost" by an injured living claimant up to the date of settlement or judgment. Both injured and dead claimants cannot work because of their condition which was created by the alleged negligence of IIGA's insured. The status of "living" versus "dead" is not what has caused the loss of wages; it is the inability to work due to the negligent conduct of the tortfeasor.

BRMC does not claim IIGA is responsible for the anticipated lifetime earnings of the decedent. Rather BRMC contends that the term "actually lost" is intended to eliminate IIGA's exposure to projected future lost wages, not to distinguish between living and dead claimants. Otherwise stated, BRMC urges that the term is intended to limit IIGA's exposure to payment for wages incurred to the date of payment whether or not the claimant survives.

4

The Court of Appeals conceded BRMC's point that excluding the lost wages of deceased claimants but allowing lost wages of a surviving claimant under 7(a)(i)(1) produces an anomaly. Ind. Ins. Guar. Ass'n, 841 N.E.2d at 583-84. However, the Court of Appeals found that "it is not within [the court's] province to take from or to enlarge the meaning of a statute by reading into it language that would . . . correct any supposed omissions or errors therein." Id. at 584 (citing Payne v. State, 396 N.E.2d 439, 441 (Ind. Ct. App. 1979)).

The Court of Appeals observed that this is an issue of first impression in Indiana, and we do not find cases from other jurisdictions to be on point. IIGA cites Flanagan v. Liberty Mutual Insurance Co., 417 N.E.2d 1216 (Mass. 1981) in support of its position that loss of wages for "inability to work" refers only to losses incurred by living individuals. We agree that Flanagan reached that conclusion in interpreting the phrase "amounts actually lost by reason of inability to work and earn wages" under the Massachusetts no-fault insurance law. Id. at 1220. We do not find it persuasive as to the Indiana Guaranty Association Law. Flanagan pointed to the purpose of the Massachusetts no-fault statute as a ground for its decision. That statute provided that each motorist involved in an accident can recover up to $2000 from the motorist's insurer, irrespective of fault in causing the loss. The statute was designed to reduce premiums by reducing litigation over small claims. The Flanagan court thought the statute's use of the term "actually lost" reinforced its general conclusion that the no-fault statute was intended to reimburse only out of pocket expenses. Id. at 1219-20. More importantly, at the time the Massachusetts no-fault statute was adopted, the Massachusetts Wrongful Death statute did not allow for lost wages. Id. at 1219 n.4. It was therefore reasonable to assume the no-fault statute did not contemplate a claim for lost wages of a decedent.

Neither of these reasons applies to Indiana's Guaranty Association Law. The Indiana Wrongful Death Statute did permit lost wages at the time the Act was adopted,[3] and the Act explicitly applied "the limitations" of the Wrongful Death Act to the right of reimbursement from IIGA. Moreover, the purpose of a no-fault law is to reduce costs of litigation and therefore reduce premiums to the policyholders, not to provide backup for the coverage the policyholder chose to purchase. The purpose of the Act, on the other hand, is to provide coverage to policyholders of failed insolvent companies and benefits to injured third parties, subject only to the

---

[3] See I.C. § 34-1-1-1 (1971).

5

limits of the Act and whatever restrictions would apply to coverage under their policies. We agree with BRMC that for these purposes there is no rational distinction between a living claimant and a dead one. The survivors of the deceased tort victim have suffered every bit as much economic loss as is incurred by the surviving victim. And, of course, from the point of view of the policyholder, payment of one claim is as economically painful as payment of the other, so failure of the insolvent insurer visits an equal loss on the policyholder.

IIGA also cites Terminix International Co. v. Tennessee Insurance Guaranty Ass'n, 845 S.W.2d 772 (Tenn. Ct. App. 1992) in support of its contention that a deceased claimant has no wages "actually lost." Tennessee's Insurance Guaranty Act, like Indiana's, obligates its Insurance Guaranty Association (TIGA) to pay "amounts actually lost by reason of claimant's inability to work and earn wages or salary or their equivalent that would otherwise have been earned in the normal course of such injured claimant's employment." Tenn. Code Ann. § 56-12-107(a)(1)(B). Although the Tennessee statute is similar to Indiana's, the issue in Terminix is quite different from the one before us. Terminix dealt with the question of projected future wages, not with whether payments to the estate of a deceased claimant for wages up to the date of settlement are wages "actually lost." The insured had settled two separate personal injury lawsuits before its excess liability insurer was liquidated by a New Jersey court. 845 S.W.2d at 773. The underlying policy had paid its limits of $500,000 in each case. The first suit settled for $750,000, leaving $250,000 unreimbursed by the insolvent excess carrier. The plaintiff in that case had lost wages of $16,778 on the date of settlement.[4] Id. The court dismissed this $16,778 issue by observing that it was far less than the $500,000 the claimant had been paid under the underlying policy. Id. at 774. We understand the court's point to be that no part of that claim remained to be paid by the insolvent excess carrier. The second suit settled for $1,400,000. The claimant in that case was seven years old at the time of settlement and had no lost wages. Id. Both claimants, though injured, were still living. Loss of future earning capacity was therefore the only issue in each settlement, and Terminix did not address the effect, if any, of a death of the claimant on the ability of the defendant policyholder to recover from TIGA.

IIGA also points to a difference between the Missouri and Indiana Acts in support of its contention that a decedent's wages are not "actually lost" under Indiana's Act. Missouri's insur-

---

[4] The total lost wages were $48,320, of which $31,542 had been reimbursed by workers' compensation temporary total disability benefits. Terminix, 845 S.W.2d at 773.

ance guaranty statute provides that "any amounts lost or to be lost by reason of claimant's inability to work and earn wages or salary or their equivalent" are covered claims for which the Association is obligated to pay. Mo. Rev. Stat. § 375.775. IIGA contends that by including "to be lost," in its statute, Missouri recognized that "amounts actually lost" did not include a claim for lost "future earnings" and therefore it, unlike Indiana, "expressly provided for the recovery of lost future earnings." This argument relates to projected future earnings, not to BRMC's claim to be reimbursed for wages to the date of settlement with the Estate. In any event, pointing out that the statute could be clearer on the issue before us cuts both ways. The Indiana legislature could have expressly excluded claims for the lost wages of deceased claimants if it intended to treat them differently from claims by survivors, but there is no such differentiation in the Indiana Act.

We think the most straightforward reading of the Indiana statute supports the inclusion of a deceased claimant's lost wages in the amount reimbursable under section 7(a)(i)(1). If Brown had survived at his current rate of employment, he would have earned over $170,000 from the date of his death to the time of settlement. Certainly, in practical terms this is an "actual" loss for which BRMC is responsible and which is covered by its PHICO liability policy. In economic terms there is no difference between the lost wages of a disabled claimant and those of a deceased claimant. If either is employed at time the defendant caused harm, the claimant's lost wages are equally real. We see no reason to deviate from this reading of the statute. The Act refers to "claims arising from bodily injury, sickness, or disease, including death resulting therefrom." I.C. § 27-6-8-7(a)(i)(1). It thus batches wrongful death claims with other bodily injury claims. It then defines the elements of damage underlying a covered claim including "any amounts actually lost by reason of the claimant's inability to work and earn wages or salary or their equivalent that would otherwise have been earned in the normal course of such injured claimant's employment." Id. This language does not differentiate between disabled and dead claimants, both of whom are unable to work. Finally, it expressly addresses wrongful death claims by providing that they are "subject to the limitations provided by the wrongful death statutes of the state." Id. The Act thus makes clear that the legislature contemplated death as a basis for a "covered claim" subject to any additional limitations of the Wrongful Death Act. As already noted, unlike the Massachusetts no-fault statute discussed in Flanagan, the Indiana Wrongful Death Act allows lost wage claims.

7

In sum, the statutory language leaves us with the "actually lost" limitation of section 7(a)(i)(1) of the Guaranty Association Act but no other relevant limitation of IIGA's obligation to BRMC. IIGA argues that a deceased person has no earning power and that wages are not lost "until the time passes that one fails to earn wages that otherwise would have been earned." We think that time did pass. Brown earned twelve dollars per hour and normally worked forty hours per week. His death was allegedly attributable to BRMC, and his claim was settled on that basis. Thus, there is no need to speculate as to what his lost wages were at the time of settlement. Lost wages caused by a death are as readily calculable as those arising from disability. Brown died on January 13, 1997, and his estate settled its claim on November 24, 2003, producing lost wages of $171,840 (358 weeks x 40 hours x $12).

Finally, we concede that our reading of the statute to permit reimbursement of lost wage claims to the date of payment, but not prospectively, is itself problematic because it may encourage delay in resolving claims. The legislature may seek to address this issue, but as the statute stands today, we conclude that allowing reimbursement for lost wage claims of a decedent is the proper reading and one consistent with the IIGA's practice of reimbursing policyholders for wage claims to the date of settlement with living claimants.

## Conclusion

The trial court's grant of summary judgment for BRMC is affirmed.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.

8